(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ADOPTIVE COUPLE *v.* BABY GIRL, A MINOR CHILD UNDER THE AGE OF FOURTEEN YEARS, ET AL.

CERTIORARI TO THE SUPREME COURT OF SOUTH CAROLINA

No. 12–399.   Argued April 16, 2013—Decided June 25, 2013

The Indian Child Welfare Act of 1978 (ICWA), which establishes federal standards for state-court child custody proceedings involving Indian children, was enacted to address "the consequences . . . of abusive child welfare practices that [separated] Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes," *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 32.  As relevant here, the ICWA bars involuntary termination of a parent's rights in the absence of a heightened showing that serious harm to the Indian child is likely to result from the parent's "continued custody" of the child, 25 U. S. C. §1912(f); conditions involuntary termination of parental rights with respect to an Indian child on a showing that remedial efforts have been made to prevent the "breakup of the Indian family," §1912(d); and provides placement preferences for the adoption of Indian children to members of the child's extended family, other members of the Indian child's tribe, and other Indian families, §1915(a).

   While Birth Mother was pregnant with Biological Father's child, their relationship ended and Biological Father (a member of the Cherokee Nation) agreed to relinquish his parental rights.  Birth Mother put Baby Girl up for adoption through a private adoption agency and selected Adoptive Couple, non-Indians living in South Carolina.  For the duration of the pregnancy and the first four months after Baby Girl's birth, Biological Father provided no financial assistance to Birth Mother or Baby Girl.  About four months after Baby Girl's birth, Adoptive Couple served Biological Father with notice of the pending adoption.  In the adoption proceedings, Biological Father sought custody and stated that he did not consent to the adoption.  Following a trial, which took place when Baby Girl was two

years old, the South Carolina Family Court denied Adoptive Couple's adoption petition and awarded custody to Biological Father. At the age of 27 months, Baby Girl was handed over to Biological Father, whom she had never met. The State Supreme Court affirmed, concluding that the ICWA applied because the child custody proceeding related to an Indian child; that Biological Father was a "parent" under the ICWA; that §§1912(d) and (f) barred the termination of his parental rights; and that had his rights been terminated, §1915(a)'s adoption-placement preferences would have applied.

*Held*:

1. Assuming for the sake of argument that Biological Father is a "parent" under the ICWA, neither §1912(f) nor §1912(d) bars the termination of his parental rights. Pp. 6–14.

(a) Section 1912(f) conditions the involuntary termination of parental rights on a heightened showing regarding the merits of the parent's "continued custody of the child." The adjective "continued" plainly refers to a pre-existing state under ordinary dictionary definitions. The phrase "continued custody" thus refers to custody that a parent already has (or at least had at some point in the past). As a result, §1912(f) does not apply where the Indian parent *never* had custody of the Indian child. This reading comports with the statutory text, which demonstrates that the ICWA was designed primarily to counteract the unwarranted *removal* of Indian children from Indian families. See §1901(4). But the ICWA's primary goal is not implicated when an Indian child's adoption is voluntarily and lawfully initiated by a non-Indian parent with sole custodial rights. Nonbinding guidelines issued by the Bureau of Indian Affairs (BIA) demonstrate that the BIA envisioned that §1912(f)'s standard would apply only to termination of a *custodial* parent's rights. Under this reading, Biological Father should not have been able to invoke §1912(f) in this case because he had never had legal or physical custody of Baby Girl as of the time of the adoption proceedings. Pp. 7–11.

(b) Section §1912(d) conditions an involuntary termination of parental rights with respect to an Indian child on a showing "that active efforts have been made to provide remedial services . . . designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Consistent with this text, §1912(d) applies only when an Indian family's "breakup" would be precipitated by terminating parental rights. The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity," Webster's Third New International Dictionary 273 (1961). But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is

Syllabus

no "relationship" to be "discontinu[ed]" and no "effective entity" to be "end[ed]" by terminating the Indian parent's rights. In such a situation, the "breakup of the Indian family" has long since occurred, and §1912(d) is inapplicable. This interpretation is consistent with the explicit congressional purpose of setting certain "standards for the removal of Indian children from their families," §1902, and with BIA Guidelines. Section 1912(d)'s proximity to §§1912(e) and (f), which both condition the outcome of proceedings on the merits of an Indian child's "continued custody" with his parent, strongly suggests that the phrase "breakup of the Indian family" should be read in harmony with the "continued custody" requirement. Pp. 11–14.

2. Section 1915(a)'s adoption-placement preferences are inapplicable in cases where no alternative party has formally sought to adopt the child. No party other than Adoptive Couple sought to adopt Baby Girl in the Family Court or the South Carolina Supreme Court. Biological Father is not covered by §1915(a) because he did not seek to adopt Baby Girl; instead, he argued that his parental rights should not be terminated in the first place. And custody was never sought by Baby Girl's paternal grandparents, other members of the Cherokee Nation, or other Indian families. Pp. 14–16.

398 S. C. 625, 731 S. E. 2d 550, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, and BREYER, JJ., joined. THOMAS, J., and BREYER, J., filed concurring opinions. SCALIA, J., filed a dissenting opinion. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG and KAGAN, JJ., joined, and in which SCALIA, J., joined in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–399

ADOPTIVE COUPLE, PETITIONERS *v.* BABY GIRL,
A MINOR CHILD UNDER THE AGE OF
FOURTEEN YEARS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 25, 2013]

JUSTICE ALITO delivered the opinion of the Court.

This case is about a little girl (Baby Girl) who is classified as an Indian because she is 1.2% (3/256) Cherokee. Because Baby Girl is classified in this way, the South Carolina Supreme Court held that certain provisions of the federal Indian Child Welfare Act of 1978 required her to be taken, at the age of 27 months, from the only parents she had ever known and handed over to her biological father, who had attempted to relinquish his parental rights and who had no prior contact with the child. The provisions of the federal statute at issue here do not demand this result.

Contrary to the State Supreme Court's ruling, we hold that 25 U. S. C. §1912(f)—which bars involuntary termination of a parent's rights in the absence of a heightened showing that serious harm to the Indian child is likely to result from the parent's "continued custody" of the child—does not apply when, as here, the relevant parent never had custody of the child. We further hold that §1912(d)—which conditions involuntary termination of parental

rights with respect to an Indian child on a showing that remedial efforts have been made to prevent the "breakup of the Indian family"—is inapplicable when, as here, the parent abandoned the Indian child before birth and never had custody of the child. Finally, we clarify that §1915(a), which provides placement preferences for the adoption of Indian children, does not bar a non-Indian family like Adoptive Couple from adopting an Indian child when no other eligible candidates have sought to adopt the child. We accordingly reverse the South Carolina Supreme Court's judgment and remand for further proceedings.

I

"The Indian Child Welfare Act of 1978 (ICWA), 92 Stat. 3069, 25 U. S. C. §§1901–1963, was the product of rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 32 (1989). Congress found that "an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." §1901(4). This "wholesale removal of Indian children from their homes" prompted Congress to enact the ICWA, which establishes federal standards that govern state-court child custody proceedings involving Indian children. *Id.,* at 32, 36 (internal quotation marks omitted); see also §1902 (declaring that the ICWA establishes "minimum Federal standards for the removal of Indian children from their families").[1]

––––––––––

[1] It is undisputed that Baby Girl is an "Indian child" as defined by the ICWA because she is an unmarried minor who "is eligible for membership in an Indian tribe and is the biological child of a member of an

Three provisions of the ICWA are especially relevant to this case. *First*, "[a]ny party seeking" an involuntary termination of parental rights to an Indian child under state law must demonstrate that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." §1912(d). *Second*, a state court may not involuntarily terminate parental rights to an Indian child "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." §1912(f). *Third*, with respect to adoptive placements for an Indian child under state law, "a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." §1915(a).

## II

In this case, Birth Mother (who is predominantly Hispanic) and Biological Father (who is a member of the Cherokee Nation) became engaged in December 2008. One month later, Birth Mother informed Biological Father, who lived about four hours away, that she was pregnant. After learning of the pregnancy, Biological Father

---

Indian tribe," §1903(4)(b). See Brief for Respondent Birth Father 1, 51, n. 22; Brief for Respondent Cherokee Nation 1; Brief for Petitioners 44 ("Baby Girl's eligibility for membership in the Cherokee Nation depends solely upon a lineal blood relationship with a tribal ancestor"). It is also undisputed that the present case concerns a "child custody proceeding," which the ICWA defines to include proceedings that involve "termination of parental rights" and "adoptive placement," §1903(1).

asked Birth Mother to move up the date of the wedding. He also refused to provide any financial support until after the two had married. The couple's relationship deteriorated, and Birth Mother broke off the engagement in May 2009. In June, Birth Mother sent Biological Father a text message asking if he would rather pay child support or relinquish his parental rights. Biological Father responded via text message that he relinquished his rights.

Birth Mother then decided to put Baby Girl up for adoption. Because Birth Mother believed that Biological Father had Cherokee Indian heritage, her attorney contacted the Cherokee Nation to determine whether Biological Father was formally enrolled. The inquiry letter misspelled Biological Father's first name and incorrectly stated his birthday, and the Cherokee Nation responded that, based on the information provided, it could not verify Biological Father's membership in the tribal records.

Working through a private adoption agency, Birth Mother selected Adoptive Couple, non-Indians living in South Carolina, to adopt Baby Girl. Adoptive Couple supported Birth Mother both emotionally and financially throughout her pregnancy. Adoptive Couple was present at Baby Girl's birth in Oklahoma on September 15, 2009, and Adoptive Father even cut the umbilical cord. The next morning, Birth Mother signed forms relinquishing her parental rights and consenting to the adoption. Adoptive Couple initiated adoption proceedings in South Carolina a few days later, and returned there with Baby Girl. After returning to South Carolina, Adoptive Couple allowed Birth Mother to visit and communicate with Baby Girl.

It is undisputed that, for the duration of the pregnancy and the first four months after Baby Girl's birth, Biological Father provided no financial assistance to Birth Mother or Baby Girl, even though he had the ability to do so. Indeed, Biological Father "made no meaningful attempts

to assume his responsibility of parenthood" during this period. App. to Pet. for Cert. 122a (Sealed; internal quotation marks omitted).

Approximately four months after Baby Girl's birth, Adoptive Couple served Biological Father with notice of the pending adoption. (This was the first notification that they had provided to Biological Father regarding the adoption proceeding.) Biological Father signed papers stating that he accepted service and that he was "not contesting the adoption." App. 37. But Biological Father later testified that, at the time he signed the papers, he thought that he was relinquishing his rights to Birth Mother, not to Adoptive Couple.

Biological Father contacted a lawyer the day after signing the papers, and subsequently requested a stay of the adoption proceedings.[2] In the adoption proceedings, Biological Father sought custody and stated that he did not consent to Baby Girl's adoption. Moreover, Biological Father took a paternity test, which verified that he was Baby Girl's biological father.

A trial took place in the South Carolina Family Court in September 2011, by which time Baby Girl was two years old. 398 S. C. 625, 634–635, 731 S. E. 2d 550, 555–556 (2012). The Family Court concluded that Adoptive Couple had not carried the heightened burden under §1912(f) of proving that Baby Girl would suffer serious emotional or physical damage if Biological Father had custody. See *id.,* at 648–651, 731 S. E. 2d, at 562–564. The Family Court therefore denied Adoptive Couple's petition for adoption and awarded custody to Biological Father. *Id.,* at 629, 636, 731 S. E. 2d, at 552, 556. On December 31, 2011, at

————————

[2] Around the same time, the Cherokee Nation identified Biological Father as a registered member and concluded that Baby Girl was an "Indian child" as defined in the ICWA. The Cherokee Nation intervened in the litigation approximately three months later.

the age of 27 months, Baby Girl was handed over to Bio-
logical Father, whom she had never met.[3]

The South Carolina Supreme Court affirmed the Family
Court's denial of the adoption and the award of custody to
Biological Father. *Id.,* at 629, 731 S. E. 2d, at 552. The
State Supreme Court first determined that the ICWA
applied because the case involved a child custody proceed-
ing relating to an Indian child. *Id.,* at 637, 643, n. 18, 731
S. E. 2d, at 556, 560, n. 18. It also concluded that Biologi-
cal Father fell within the ICWA's definition of a "'parent.'"
*Id.,* at 644, 731 S. E. 2d, at 560. The court then held that
two separate provisions of the ICWA barred the termina-
tion of Biological Father's parental rights. *First*, the court
held that Adoptive Couple had not shown that "active
efforts ha[d] been made to provide remedial services and
rehabilitative programs designed to prevent the breakup
of the Indian family." §1912(d); see also *id.,* at 647–648,
731 S. E. 2d, at 562. *Second*, the court concluded that
Adoptive Couple had not shown that Biological Father's
"custody of Baby Girl would result in serious emotional or
physical harm to her beyond a reasonable doubt." *Id.,* at
648–649, 731 S. E. 2d, at 562–563 (citing §1912(f)). Finally,
the court stated that, even if it had decided to terminate
Biological Father's parental rights, §1915(a)'s adoption-
placement preferences would have applied. *Id.,* at 655–657,
731 S. E. 2d, at 566–567. We granted certiorari. 568 U. S.
___ (2013).

### III

It is undisputed that, had Baby Girl not been 3/256
Cherokee, Biological Father would have had no right to

_____

[3] According to the guardian ad litem, Biological Father allowed Baby
Girl to speak with Adoptive Couple by telephone the following day, but
then cut off all communication between them. Moreover, according to
Birth Mother, Biological Father has made no attempt to contact her
since the time he took custody of Baby Girl.

object to her adoption under South Carolina law. See Tr. of Oral Arg. 49; 398 S. C., at 644, n. 19, 731 S. E. 2d, at 560, n. 19 ("Under state law, [Biological] Father's consent to the adoption would not have been required"). The South Carolina Supreme Court held, however, that Biological Father is a "parent" under the ICWA and that two statutory provisions—namely, §1912(f) and §1912(d)—bar the termination of his parental rights. In this Court, Adoptive Couple contends that Biological Father is not a "parent" and that §1912(f) and §1912(d) are inapplicable. We need not—and therefore do not—decide whether Biological Father is a "parent." See §1903(9) (defining "parent").[4] Rather, assuming for the sake of argument that he is a "parent," we hold that neither §1912(f) nor §1912(d) bars the termination of his parental rights.

## A

Section 1912(f) addresses the involuntary termination of parental rights with respect to an Indian child. Specifically, §1912(f) provides that "[n]o termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, . . . that the *continued custody* of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.) The South Carolina Supreme Court held that Adoptive Couple failed to satisfy §1912(f) because they did not make a heightened showing that Biological Father's "*prospective* legal and physical custody" would likely result in serious damage to the child. 398 S. C., at 651, 731 S. E. 2d, at 564 (emphasis added). That holding was error.

———————

[4] If Biological Father is not a "parent" under the ICWA, then §1912(f) and §1912(d)—which relate to proceedings involving possible termination of "parental" rights—are inapplicable. Because we conclude that these provisions are inapplicable for other reasons, however, we need not decide whether Biological Father is a "parent."

Section 1912(f) conditions the involuntary termination of parental rights on a showing regarding the merits of "*continued* custody of the child by the parent." (Emphasis added.) The adjective "continued" plainly refers to a pre-existing state. As JUSTICE SOTOMAYOR concedes, *post,* at 11 (dissenting opinion) (hereinafter the dissent), "continued" means "[c]arried on or kept up without cessation" or "[e]xtended in space without interruption or breach of conne[ct]ion." Compact Edition of the Oxford English Dictionary 909 (1981 reprint of 1971 ed.) (Compact OED); see also American Heritage Dictionary 288 (1981) (defining "continue" in the following manner: "1. To go on with a particular action or in a particular condition; persist. . . . 3. To remain in the same state, capacity, or place"); Webster's Third New International Dictionary 493 (1961) (Webster's) (defining "continued" as "stretching out in time or space esp. without interruption"); *Aguilar* v. *FDIC*, 63 F. 3d 1059, 1062 (CA11 1995) (*per curiam*) (suggesting that the phrase "continue an action" means "go on with . . . an action" that is "preexisting"). The term "continued" also can mean "resumed after interruption." Webster's 493; see American Heritage Dictionary 288. The phrase "continued custody" therefore refers to custody that a parent already has (or at least had at some point in the past). As a result, §1912(f) does not apply in cases where the Indian parent *never* had custody of the Indian child.[5]

Biological Father's contrary reading of §1912(f) is non-sensical. Pointing to the provision's requirement that

––––––––––

[5] With a torrent of words, the dissent attempts to obscure the fact that its interpretation simply cannot be squared with the statutory text. A biological father's "continued custody" of a child cannot be assessed if the father never had custody at all, and the use of a different phrase—"termination of parental rights"—cannot change that. In addition, the dissent's reliance on subsection headings, *post,* at 9, overlooks the fact that those headings were not actually enacted by Congress. See 92 Stat. 3071–3072.

"[n]o termination of parental rights may be ordered . . . in the absence of a determination" relating to "the continued custody of the child by the parent," Biological Father contends that if a determination relating to "continued custody" is inapposite in cases where there is no "custody," the statutory text *prohibits* termination. See Brief for Respondent Birth Father 39. But it would be absurd to think that Congress enacted a provision that *permits* termination of a custodial parent's rights, while simultaneously *prohibiting* termination of a noncustodial parent's rights. If the statute draws any distinction between custodial and noncustodial parents, that distinction surely does not provide greater protection for noncustodial parents.[6]

Our reading of §1912(f) comports with the statutory text demonstrating that the primary mischief the ICWA was designed to counteract was the unwarranted *removal* of Indian children from Indian families due to the cultural insensitivity and biases of social workers and state courts. The statutory text expressly highlights the primary problem that the statute was intended to solve: "an alarmingly high percentage of Indian families [were being] broken up by the *removal*, often unwarranted, of their children from them by nontribal public and private agencies." §1901(4) (emphasis added); see also §1902 (explaining that the ICWA establishes "minimum Federal standards for the *removal* of Indian children from their families" (emphasis added)); *Holyfield*, 490 U. S., at 32–34. And if the legislative history of the ICWA is thought to be relevant, it fur-

_____

[6] The dissent criticizes us for allegedly concluding that a biological father qualifies for "substantive" statutory protections "only when [he] has physical or state-recognized legal custody." *Post,* at 2, 6–7. But the dissent undercuts its own point when it states that "numerous" ICWA provisions not at issue here afford "meaningful" protections to biological fathers regardless of whether they ever had custody. *Post,* at 4–7, and nn. 1, 2.

ther underscores that the Act was primarily intended to stem the unwarranted removal of Indian children from intact Indian families. See, *e.g.,* H. R. Rep. No. 95–1386, p. 8 (1978) (explaining that, as relevant here, "[t]he purpose of [the ICWA] is to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by establishing minimum Federal standards for the *removal* of Indian children from their families and the placement of such children in foster or adoptive homes" (emphasis added)); *id.,* at 9 (decrying the "wholesale separation of Indian children" from their Indian families); *id.,* at 22 (discussing "the removal" of Indian children from their parents pursuant to §§1912(e) and (f)). In sum, when, as here, the adoption of an Indian child is voluntarily and lawfully initiated by a non-Indian parent with sole custodial rights, the ICWA's primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families is not implicated.

The dissent fails to dispute that nonbinding guidelines issued by the Bureau of Indian Affairs (BIA) shortly after the ICWA's enactment demonstrate that the BIA envisioned that §1912(f)'s standard would apply only to termination of a *custodial* parent's rights. Specifically, the BIA stated that, under §1912(f), "[a] child may not be *removed* simply because there is someone else willing to raise the child who is likely to do a better job"; instead, "[i]t must be shown that . . . it is dangerous for the child to *remain* with his or her *present* custodians." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67593 (1979) (emphasis added) (hereinafter Guidelines). Indeed, the Guidelines recognized that §1912(f) applies only when there is pre-existing custody to evaluate. See *ibid.* ("[T]he issue on which qualified expert testimony is required is the question of whether or not serious damage to the child is likely to occur if the child is not removed").

Under our reading of §1912(f), Biological Father should

not have been able to invoke §1912(f) in this case, because he had never had legal or physical custody of Baby Girl as of the time of the adoption proceedings. As an initial matter, it is undisputed that Biological Father never had *physical* custody of Baby Girl. And as a matter of both South Carolina and Oklahoma law, Biological Father never had *legal* custody either. See S. C. Code Ann. §63–17–20(B) (2010) ("Unless the court orders otherwise, the custody of an illegitimate child is solely in the natural mother unless the mother has relinquished her rights to the child"); Okla. Stat., Tit. 10, §7800 (West Cum. Supp. 2013) ("Except as otherwise provided by law, the mother of a child born out of wedlock has custody of the child until determined otherwise by a court of competent jurisdiction").[7]

In sum, the South Carolina Supreme Court erred in finding that §1912(f) barred termination of Biological Father's parental rights.

### B

Section 1912(d) provides that "[a]ny party" seeking to terminate parental rights to an Indian child under state law "shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed *to prevent the breakup of the Indian*

———————

[7] In an effort to rebut our supposed conclusion that "Congress *could not* possibly have intended" to require legal termination of Biological Father's rights with respect to Baby Girl, the dissent asserts that a minority of States afford (or used to afford) protection to similarly situated biological fathers. See *post,* at 17–18, and n. 12 (emphasis added). This is entirely beside the point, because we merely conclude that, based on the statute's text and structure, Congress *did not* extend the heightened protections of §1912(d) and §1912(f) to all biological fathers. The fact that state laws may provide certain protections to biological fathers who have abandoned their children and who have never had custody of their children in no way undermines our analysis of these two federal statutory provisions.

*family* and that these efforts have proved unsuccessful." (Emphasis added.)  The South Carolina Supreme Court found that Biological Father's parental rights could not be terminated because Adoptive Couple had not demonstrated that Biological Father had been provided remedial services in accordance with §1912(d).  398 S. C., at 647–648, 731 S. E. 2d, at 562.  We disagree.

Consistent with the statutory text, we hold that §1912(d) applies only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights.  The term "breakup" refers in this context to "[t]he discontinuance of a relationship," American Heritage Dictionary 235 (3d ed. 1992), or "an ending as an effective entity," Webster's 273 (defining "breakup" as "a disruption or dissolution into component parts: an ending as an effective entity").  See also Compact OED 1076 (defining "break-up" as, *inter alia*, a "disruption, separation into parts, disintegration").  But when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no "relationship" that would be "discontinu[ed]"—and no "effective entity" that would be "end[ed]"—by the termination of the Indian parent's rights.  In such a situation, the "breakup of the Indian family" has long since occurred, and §1912(d) is inapplicable.

Our interpretation of §1912(d) is, like our interpretation of §1912(f), consistent with the explicit congressional purpose of providing certain "standards for the *removal* of Indian children from their families."  §1902 (emphasis added); see also, *e.g.,* §1901(4); *Holyfield*, 490 U. S., at 32–34.  In addition, the BIA's Guidelines confirm that remedial services under §1912(d) are intended "to alleviate the need to *remove* the Indian child from his or her parents or Indian custodians," not to facilitate a *transfer* of the child *to* an Indian parent.  See 44 Fed. Reg., at 67592 (emphasis

added).

Our interpretation of §1912(d) is also confirmed by the provision's placement next to §1912(e) and §1912(f), both of which condition the outcome of proceedings on the merits of an Indian child's "continued custody" with his parent. That these three provisions appear adjacent to each other strongly suggests that the phrase "breakup of the Indian family" should be read in harmony with the "continued custody" requirement. See *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988) (explaining that statutory construction "is a holistic endeavor" and that "[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme"). None of these three provisions *creates* parental rights for unwed fathers where no such rights would otherwise exist. Instead, Indian parents who are already part of an "Indian family" are provided with access to "remedial services and rehabilitative programs" under §1912(d) so that their "custody" might be "continued" in a way that avoids foster-care placement under §1912(e) or termination of parental rights under §1912(f). In other words, the provision of "remedial services and rehabilitative programs" under §1912(d) supports the "continued custody" that is protected by §1912(e) and §1912(f).[8]

_____

[8] The dissent claims that our reasoning "necessarily extends to *all* Indian parents who have never had custody of their children," even if those parents have visitation rights. *Post,* at 2–3, 13–14. As an initial matter, the dissent's concern about the effect of our decision on individuals with visitation rights will be implicated, at most, in a relatively small class of cases. For example, our interpretation of §1912(d) would implicate the dissent's concern only in the case of a parent who abandoned his or her child prior to birth and *never* had physical or legal custody, but *did* have some sort of visitation rights. Moreover, in cases where this concern is implicated, such parents might receive "comparable" protections under state law. See *post,* at 15. And in any event, it is the *dissent's* interpretation that would have far-reaching consequences:

Section 1912(d) is a sensible requirement when applied to state social workers who might otherwise be too quick to remove Indian children from their Indian families. It would, however, be unusual to apply §1912(d) in the context of an Indian parent who abandoned a child prior to birth and who never had custody of the child. The decision below illustrates this point. The South Carolina Supreme Court held that §1912(d) mandated measures such as "attempting to stimulate [Biological] Father's desire to be a parent." 398 S. C., at 647, 731 S. E. 2d, at 562. But if prospective adoptive parents were required to engage in the bizarre undertaking of "stimulat[ing]" a biological father's "desire to be a parent," it would surely dissuade some of them from seeking to adopt Indian children.[9] And this would, in turn, unnecessarily place vulnerable Indian children at a unique disadvantage in finding a permanent and loving home, even in cases where neither an Indian parent nor the relevant tribe objects to the adoption.[10]

In sum, the South Carolina Supreme Court erred in finding that §1912(d) barred termination of Biological Father's parental rights.

## IV

In the decision below, the South Carolina Supreme

---

Under the dissent's reading, *any* biological parent—even a sperm donor—would enjoy the heightened protections of §1912(d) and §1912(f), even if he abandoned the mother and the child immediately after conception. *Post,* at 14, n. 8.

[9] Biological Father and the Solicitor General argue that a tribe or state agency *could* provide the requisite remedial services under §1912(d). Brief for Respondent Birth Father 43; Brief for United States as *Amicus Curiae* 22. But what if they don't? And if they don't, would the adoptive parents have to undertake the task?

[10] The dissent repeatedly mischaracterizes our opinion. As our detailed discussion of the terms of the ICWA makes clear, our decision is not based on a "[p]olicy disagreement with Congress' judgment." *Post,* at 2; see also *post,* at 8, 21.

Court suggested that if it had terminated Biological Father's rights, then §1915(a)'s preferences for the adoptive placement of an Indian child would have been applicable. 398 S. C., at 655–657, 731 S. E. 2d, at 566–567.  In so doing, however, the court failed to recognize a critical limitation on the scope of §1915(a).

Section 1915(a) provides that "[i]n any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."  Contrary to the South Carolina Supreme Court's suggestion, §1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child.  This is because there simply is no "preference" to apply if no alternative party that is eligible to be preferred under §1915(a) has come forward.

In this case, Adoptive Couple was the only party that sought to adopt Baby Girl in the Family Court or the South Carolina Supreme Court.  See Brief for Petitioners 19, 55; Brief for Respondent Birth Father 48; Reply Brief for Petitioners 13.  Biological Father is not covered by §1915(a) because he did not seek to *adopt* Baby Girl; instead, he argued that his parental rights should not be terminated in the first place.[11]  Moreover, Baby Girl's

———————

[11] Section 1915(c) also provides that, in the case of an adoptive placement under §1915(a), "if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in [§1915(b)]."  Although we need not decide the issue here, it may be the case that an Indian child's tribe could alter §1915's preferences in a way that includes a biological father whose rights were terminated, but who has now reformed.  See §1915(c).  If a tribe were to take such an approach, however, the court would still have the power to determine whether "good cause" exists to disregard the tribe's order of

paternal grandparents never sought custody of Baby Girl. See Brief for Petitioners 55; Reply Brief for Petitioners 13; 398 S. C., at 699, 731 S. E. 2d, at 590 (Kittredge, J., dissenting) (noting that the "paternal grandparents are not parties to this action"). Nor did other members of the Cherokee Nation or "other Indian families" seek to adopt Baby Girl, even though the Cherokee Nation had notice of—and intervened in—the adoption proceedings. See Brief for Respondent Cherokee Nation 21–22; Reply Brief for Petitioners 13–14.[12]

\*          \*          \*

The Indian Child Welfare Act was enacted to help preserve the cultural identity and heritage of Indian tribes, but under the State Supreme Court's reading, the Act would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian. As the State Supreme Court read §§1912(d) and (f), a biological Indian father could abandon his child *in utero* and refuse any support for the birth mother—perhaps contributing to the mother's decision to put the child up for adoption—and then could play his ICWA trump card at the eleventh hour to override the mother's decision and the child's best interests. If this were possible, many prospective adoptive parents would surely pause before adopting any child who might possibly qualify as an Indian under the ICWA. Such an interpreta-

—————————

preference. See §§1915(a), (c); *In re Adoption of T. R. M.*, 525 N. E. 2d 298, 313 (Ind. 1988).

[12] To be sure, an employee of the Cherokee Nation testified that the Cherokee Nation certifies families to be adoptive parents and that there are approximately 100 such families "that are ready to take children that want to be adopted." Record 446. However, this testimony was only a general statement regarding the Cherokee Nation's practices; it did not demonstrate that a specific Indian family was willing to adopt Baby Girl, let alone that such a family formally sought such adoption in the South Carolina courts. See Reply Brief for Petitioners 13–14; see also Brief for Respondent Cherokee Nation 21–22.

tion would raise equal protection concerns, but the plain text of §§1912(f) and (d) makes clear that neither provision applies in the present context. Nor do §1915(a)'s rebuttable adoption preferences apply when no alternative party has formally sought to adopt the child. We therefore reverse the judgment of the South Carolina Supreme Court and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–399

_____

ADOPTIVE COUPLE, PETITIONERS *v.* BABY GIRL,
A MINOR CHILD UNDER THE AGE OF
FOURTEEN YEARS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 25, 2013]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full but write separately to explain why constitutional avoidance compels this outcome. Each party in this case has put forward a plausible interpretation of the relevant sections of the Indian Child Welfare Act (ICWA). However, the interpretations offered by respondent Birth Father and the United States raise significant constitutional problems as applied to this case. Because the Court's decision avoids those problems, I concur in its interpretation.

I

This case arises out of a contested state-court adoption proceeding. Adoption proceedings are adjudicated in state family courts across the country every day, and "domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna* v. *Iowa*, 419 U. S. 393, 404 (1975). Indeed, "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus*, 136 U. S. 586, 593–594 (1890). Nevertheless, when Adoptive Couple filed a petition in South Carolina Family Court to finalize their adoption of Baby Girl, Birth Father, who had relinquished

his parental rights via a text message to Birth Mother, claimed a federal right under the ICWA to block the adoption and to obtain custody.

The ICWA establishes "federal standards that govern state-court child custody proceedings involving Indian children." *Ante,* at 2. The ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U. S. C. §1903(4). As relevant, the ICWA defines "child custody proceeding," §1903(1), to include "adoptive placement," which means "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption," §1903(1)(iv), and "termination of parental rights," which means "any action resulting in the termination of the parent-child relationship," §1903(1)(ii).

The ICWA restricts a state court's ability to terminate the parental rights of an Indian parent in two relevant ways. Section 1912(f) prohibits a state court from involuntarily terminating parental rights "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 1912(d) prohibits a state court from terminating parental rights until the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." A third provision creates specific placement preferences for the adoption of Indian children, which favor placement with Indians over other adoptive families. §1915(a). Operating together, these requirements often lead to different outcomes than would result under state law. That is precisely

what happened here. See *ante,* at 6 ("It is undisputed that, had Baby Girl not been 3/256 Cherokee, Biological Father would have had no right to object to her adoption under South Carolina law").

The ICWA recognizes States' inherent "jurisdiction over Indian child custody proceedings," §1901(5), but asserts that federal regulation is necessary because States "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families," *ibid.* However, Congress may regulate areas of traditional state concern only if the Constitution grants it such power. Admt. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people"). The threshold question, then, is whether the Constitution grants Congress power to override state custody law whenever an Indian is involved.

## II

The ICWA asserts that the Indian Commerce Clause, Art. I, §8, cl. 3, and "other constitutional authority" provides Congress with "plenary power over Indian affairs." §1901(1). The reference to "other constitutional authority" is not illuminating, and I am aware of no other enumerated power that could even arguably support Congress' intrusion into this area of traditional state authority. See Fletcher, The Supreme Court and Federal Indian Policy, 85 Neb. L. Rev. 121, 137 (2006) ("As a matter of federal constitutional law, the Indian Commerce Clause grants Congress the only explicit constitutional authority to deal with Indian tribes"); Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U. L. Rev. 201, 210 (2007) (hereinafter Natelson) (evaluating, and rejecting, other potential sources of authority supporting congressional power over Indians). The assertion of ple-

nary authority must, therefore, stand or fall on Congress'
power under the Indian Commerce Clause.  Although this
Court has said that the "central function of the Indian
Commerce Clause is to provide Congress with plenary
power to legislate in the field of Indian affairs," *Cotton
Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192 (1989),
neither the text nor the original understanding of the
Clause supports Congress' claim to such "plenary" power.

## A

The Indian Commerce Clause gives Congress authority
"[t]o regulate *Commerce* . . . with the Indian tribes."
Art. I, §8, cl. 3 (emphasis added).  "At the time the original
Constitution was ratified, 'commerce' consisted of selling,
buying, and bartering, as well as transporting for these
purposes."  *United States* v. *Lopez*, 514 U. S. 549, 585
(1995) (THOMAS, J., concurring).  See also 1 S. Johnson, A
Dictionary of the English Language 361 (4th rev. ed. 1773)
(reprint 1978) (defining commerce as "Intercourse; ex-
change of one thing for another; interchange of any thing;
trade; traffick").  "[W]hen Federalists and Anti-Federalists
discussed the Commerce Clause during the ratification
period, they often used trade (in its selling/bartering
sense) and commerce interchangeably."  *Lopez, supra,* at
586 (THOMAS, J., concurring).  The term "commerce" did
not include economic activity such as "manufacturing and
agriculture," *ibid.*, let alone noneconomic activity such as
adoption of children.

Furthermore, the term "commerce with Indian tribes"
was invariably used during the time of the founding to
mean "'trade with Indians.'"  See, *e.g.,* Natelson, 215–216,
and n. 97 (citing 18th-century sources); Report of Commit-
tee on Indian Affairs (Feb 20, 1787), in 32 Journals of the
Continental Congress 1774–1789, pp. 66, 68 (R. Hill ed.
1936) (hereinafter J. Cont'l Cong.) (using the phrase
"commerce with the Indians" to mean trade with the

Indians). And regulation of Indian commerce generally referred to legal structures governing "the conduct of the merchants engaged in the Indian trade, the nature of the goods they sold, the prices charged, and similar matters." Natelson 216, and n. 99.

The Indian Commerce Clause contains an additional textual limitation relevant to this case: Congress is given the power to regulate Commerce "with the Indian *tribes*." The Clause does not give Congress the power to regulate commerce with all Indian *persons* any more than the Foreign Commerce Clause gives Congress the power to regulate commerce with all foreign nationals traveling within the United States. A straightforward reading of the text, thus, confirms that Congress may only regulate commercial interactions—"commerce"—taking place with established Indian communities—"tribes." That power is far from "plenary."

## B

Congress' assertion of "plenary power" over Indian affairs is also inconsistent with the history of the Indian Commerce Clause. At the time of the founding, the Clause was understood to reserve to the States general police powers with respect to Indians who were citizens of the several States. The Clause instead conferred on Congress the much narrower power to regulate trade with Indian tribes—that is, Indians who had not been incorporated into the body-politic of any State.

## 1

Before the Revolution, most Colonies adopted their own regulations governing Indian trade. See Natelson 219, and n. 121 (citing colonial laws). Such regulations were necessary because colonial traders all too often abused their Indian trading partners, through fraud, exorbitant prices, extortion, and physical invasion of Indian territory,

among other things.  See 1 F. Prucha, The Great Father 18–20 (1984) (hereinafter Prucha); Natelson 220, and n. 122.  These abuses sometimes provoked violent Indian retaliation.  See Prucha 20.  To mitigate these conflicts, most Colonies extensively regulated traders engaged in commerce with Indian tribes.  See *e.g.,* Ordinance to Regulate Indian Affairs, Statutes of South Carolina (Aug. 31, 1751), in 16 Early American Indian Documents: Treaties and Laws, 1607–1789, pp. 331–334 (A. Vaughan and D. Rosen eds. 1998).[1]  Over time, commercial regulation at the colonial level proved largely ineffective, in part because "[t]here was no uniformity among the colonies, no two sets of like regulations."  Prucha 21.

Recognizing the need for uniform regulation of trade with the Indians, Benjamin Franklin proposed his own "articles of confederation" to the Continental Congress on July 21, 1775, which reflected his view that central control over Indian affairs should predominate over local control. 2 J. Cont'l Cong. 195–199 (W. Ford ed. 1905).  Franklin's proposal was not enacted, but in November 1775, Congress empowered a committee to draft regulations for the Indian trade.  3 *id.*, at 364, 366.  On July 12, 1776, the committee submitted a draft of the Articles of Confederation to Congress, which incorporated many of Franklin's proposals.  5 *id.,* at 545, 546, n. 1.  The draft prohibited States from waging offensive war against the Indians without congressional authorization and granted Congress

––––––––––––

[1] South Carolina, for example, required traders to be licensed, to be of good moral character, and to post a bond.  Ordinance to Regulate Indian Affairs, in 16 Early American Indian Documents, at 331–334.  A potential applicant's name was posted publicly before issuing the license, so anyone with objections had an opportunity to raise them. *Id.*, at 332.  Restrictions were placed on employing agents, *id.*, at 333–334, and names of potential agents had to be disclosed.  *Id.*, at 333. Traders who violated these rules were subject to substantial penalties. *Id.*, at 331, 334.

the exclusive power to acquire land from the Indians out-side state boundaries, once those boundaries had been established. *Id.*, at 549. This version also gave Congress "the sole and exclusive Right and Power of . . . Regulating the Trade, and managing all Affairs with the Indians." *Id.* at 550.

On August 20, 1776, the Committee of the Whole presented to Congress a revised draft, which provided Congress with "the sole and exclusive right and power of . . . regulating the trade, and managing all affairs with the Indians." *Id.*, at 672, 681–682. Some delegates feared that the Articles gave Congress excessive power to interfere with States' jurisdiction over affairs with Indians residing within state boundaries. After further deliberation, the final result was a clause that included a broad grant of congressional authority with two significant exceptions: "The United States in Congress assembled shall also have the sole and exclusive right and power of . . . regulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated." Articles of Confederation, Art. IX, cl. 4. As a result, Congress retained exclusive jurisdiction over Indian affairs outside the borders of the States; the States retained exclusive jurisdiction over relations with Member-Indians;[2] and Congress and the States "exercise[d] concurrent jurisdiction over transactions with tribal Indians within state boundaries, but congressional decisions would have to be in compliance with local law." Natelson 230. The drafting of the Articles of Confedera-

———————

[2] Although Indians were generally considered "members" of a State if they paid taxes or were citizens, see Natelson 230, the precise definition of the term was "not yet settled" at the time of the founding and was "a question of frequent perplexity and contention in the federal councils," The Federalist No. 42, p. 265 (C. Rossiter ed. 1961) (J. Madison).

tion reveals the delegates' concern with protecting the power of the States to regulate Indian persons who were politically incorporated into the States. This concern for state power reemerged during the drafting of the Constitution.

2

The drafting history of the Constitutional Convention also supports a limited construction of the Indian Commerce Clause. On July 24, 1787, the convention elected a drafting committee—the Committee of Detail—and charged it to "report a Constitution conformable to the Resolutions passed by the Convention." 2 Records of the Federal Convention of 1787, p.106 (M. Farrand rev. 1966) (J. Madison). During the Committee's deliberations, John Rutledge, the chairman, suggested incorporating an Indian affairs power into the Constitution. *Id.,* at 137, n. 6, 143. The first draft reported back to the convention, however, provided Congress with authority "[t]o regulate commerce with foreign nations, and among the several States," *id.*, at 181 (Madison) (Aug. 6, 1787), but did not include any specific Indian affairs clause. On August 18, James Madison proposed that the Federal Government be granted several additional powers, including the power "[t]o regulate *affairs* with the Indians as well within as without the limits of the U. States." *Id.*, at 324 (J. Madison) (emphasis added). On August 22, Rutledge delivered the Committee of Detail's second report, which modified Madison's proposed clause. The Committee proposed to add to Congress' power "[t]o regulate commerce with foreign nations, and among the several States" the words, "and with Indians, within the Limits of any State, not subject to the laws thereof." *Id.*, at 366–367 (Journal). The Committee's version, which echoed the Articles of Confederation, was far narrower than Madison's proposal. On August 31, the revised draft was submitted to a Com-

mittee of Eleven for further action. *Id.,* at 473 (Journal), 481 (J. Madison). That Committee recommended adding to the Commerce Clause the phrase, "and with the Indian tribes," *id.*, at 493, which the Convention ultimately adopted.

It is, thus, clear that the Framers of the Constitution were alert to the difference between the power to regulate trade with the Indians and the power to regulate all Indian affairs. By limiting Congress' power to the former, the Framers declined to grant Congress the same broad powers over Indian affairs conferred by the Articles of Confederation. See Prakash, Against Tribal Fungibility, 89 Cornell L. Rev. 1069, 1090 (2004).

During the ratification debates, opposition to the Indian Commerce Clause was nearly nonexistent. See Natelson 248 (noting that Robert Yates, a New York Anti-Federalist was "almost the only writer who objected to any part [of] of the Commerce Clause—a clear indication that its scope was understood to be fairly narrow" (footnote omitted)). Given the Anti-Federalists' vehement opposition to the Constitution's other grants of power to the Federal Government, this silence is revealing. The ratifiers almost certainly understood the Clause to confer a relatively modest power on Congress—namely, the power to regulate trade with Indian tribes living beyond state borders. And this feature of the Constitution was welcomed by Federalists and Anti-Federalists alike due to the considerable interest in expanding trade with such Indian tribes. See, *e.g.,* The Federalist No. 42, at 265 (J. Madison) (praising the Constitution for removing the obstacles that had existed under the Articles of Confederation to federal control over "*trade* with Indians" (emphasis added)); 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 580 (2d ed. 1863) (Adam Stephens, at the Virginia ratifying convention, June 23, 1788, describing the Indian tribes residing near

the Mississippi and "the variety of articles which might be obtained to advantage by trading with these people"); The Federalist No. 24, at 158 (A. Hamilton) (arguing that frontier garrisons would "be keys to the trade with the Indian nations"); Brutus, (Letter) X, N. Y. J., Jan. 24, 1788, in 15 The Documentary History of the Ratification of the Constitution 462, 465 (J. Kaminski & G. Saladino eds. 2012) (conceding that there must be a standing army for some purposes, including "trade with Indians"). There is little evidence that the ratifiers of the Constitution understood the Indian Commerce Clause to confer anything resembling plenary power over Indian affairs. See Natelson 247–250.

### III

In light of the original understanding of the Indian Commerce Clause, the constitutional problems that would be created by application of the ICWA here are evident. First, the statute deals with "child custody proceedings," §1903(1), not "commerce." It was enacted in response to concerns that "an alarmingly high percentage of Indian families [were] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." §1901(4). The perceived problem was that many Indian children were "placed in non-Indian foster and adoptive homes and institutions." *Ibid.* This problem, however, had nothing to do with commerce.

Second, the portions of the ICWA at issue here do not regulate Indian tribes as tribes. Sections 1912(d) and (f), and §1915(a) apply to all child custody proceedings involving an Indian child, regardless of whether an Indian tribe is involved. This case thus does not directly implicate Congress' power to "legislate in respect to Indian *tribes*." *United States* v. *Lara*, 541 U. S. 193, 200 (2004) (emphasis added). Baby Girl was never domiciled on an Indian Reservation, and the Cherokee Nation had no jurisdiction

over her.   Cf. *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 53–54 (1989) (holding that the Indian Tribe had exclusive jurisdiction over child custody proceedings, even though the children were born off the reservation, because the children were "domiciled" on the reservation for purposes of the ICWA).   Although Birth Father is a registered member of The Cherokee Nation, he did not live on a reservation either.   He was, thus, subject to the laws of the State in which he resided (Oklahoma) and of the State where his daughter resided during the custody proceedings (South Carolina).   Nothing in the Indian Commerce Clause permits Congress to enact special laws applicable to Birth Father merely because of his status as an Indian.[3]

Because adoption proceedings like this one involve neither "commerce" nor "Indian tribes," there is simply no constitutional basis for Congress' assertion of authority over such proceedings.   Also, the notion that Congress can direct state courts to apply different rules of evidence and procedure merely because a person of Indian descent is involved raises absurd possibilities.   Such plenary power would allow Congress to dictate specific rules of criminal procedure for state-court prosecutions against Indian defendants.   Likewise, it would allow Congress to substitute federal law for state law when contract disputes involve Indians.   But the Constitution does not grant Congress power to override state law whenever that law

———————

[3] Petitioners and the guardian ad litem contend that applying the ICWA to child custody proceedings on the basis of race implicates equal protection concerns.   See Brief for Petitioners 45 (arguing that the statute would be unconstitutional "if unwed fathers with no preexisting substantive parental rights receive a statutory preference based solely on the Indian child's race"); Brief for Respondent Guardian Ad Litem 48–49 (same).   I need not address this argument because I am satisfied that Congress lacks authority to regulate the child custody proceedings in this case.

happens to be applied to Indians.  Accordingly, application of the ICWA to these child custody proceedings would be unconstitutional.

\*     \*     \*

Because the Court's plausible interpretation of the relevant sections of the ICWA avoids these constitutional problems, I concur.

# SUPREME COURT OF THE UNITED STATES

---

No. 12–399

---

ADOPTIVE COUPLE, PETITIONERS *v.* BABY GIRL,
A MINOR CHILD UNDER THE AGE OF
FOURTEEN YEARS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 25, 2013]

JUSTICE BREYER, concurring.

I join the Court's opinion with three observations. First, the statute does not directly explain how to treat an absentee Indian father who had next-to-no involvement with his child in the first few months of her life. That category of fathers may include some who would prove highly unsuitable parents, some who would be suitable, and a range of others in between. Most of those who fall within that category seem to fall outside the scope of the language of 25 U. S. C. §§1912(d) and (f). Thus, while I agree that the better reading of the statute is, as the majority concludes, to exclude most of those fathers, *ante,* at 8, 12, I also understand the risk that, from a policy perspective, the Court's interpretation could prove to exclude too many. See *post,* at 13, 22–23 (SOTOMAYOR, J., dissenting).

Second, we should decide here no more than is necessary. Thus, this case does not involve a father with visitation rights or a father who has paid "all of his child support obligations." See *post*, at 13. Neither does it involve special circumstances such as a father who was deceived about the existence of the child or a father who was prevented from supporting his child. See *post*, at 13 n. 8. The Court need not, and in my view does not, now decide whether or how §§1912(d) and (f) apply where those cir-

cumstances are present.

Third, other statutory provisions not now before us may nonetheless prove relevant in cases of this kind. Section 1915(a) grants an adoptive "preference" to "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families . . . . in the absence of good cause to the contrary." Further, §1915(c) allows the "Indian child's tribe" to "establish a different order of preference by resolution." Could these provisions allow an absentee father to re-enter the special statutory order of preference with support from the tribe, and subject to a court's consideration of "good cause?" I raise, but do not here try to answer, the question.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–399

_____

## ADOPTIVE COUPLE, PETITIONERS *v.* BABY GIRL,
### A MINOR CHILD UNDER THE AGE OF
### FOURTEEN YEARS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 25, 2013]

JUSTICE SCALIA, dissenting.

I join JUSTICE SOTOMAYOR's dissent except as to one detail. I reject the conclusion that the Court draws from the words "continued custody" in 25 U. S. C §1912(f) not because "literalness may strangle meaning," see *post*, at 11, but because there is no reason that "continued" must refer to custody in the past rather than custody in the future. I read the provision as requiring the court to satisfy itself (beyond a reasonable doubt) not merely that initial or temporary custody is not "likely to result in serious emotional or physical damage to the child," but that continued custody is not likely to do so. See Webster's New International Dictionary 577 (2d ed. 1950) (defining "continued" as "[p]rotracted in time or space, esp. without interruption; constant"). For the reasons set forth in JUSTICE SOTOMAYOR's dissent, that connotation is much more in accord with the rest of the statute.

While I am at it, I will add one thought. The Court's opinion, it seems to me, needlessly demeans the rights of parenthood. It has been the constant practice of the common law to respect the entitlement of those who bring a child into the world to raise that child. We do not inquire whether leaving a child with his parents is "in the best interest of the child." It sometimes is not; he would be

better off raised by someone else. But parents have their rights, no less than children do. This father wants to raise his daughter, and the statute amply protects his right to do so. There is no reason in law or policy to dilute that protection.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–399

_____

ADOPTIVE COUPLE, PETITIONERS *v.* BABY GIRL,
A MINOR CHILD UNDER THE AGE OF
FOURTEEN YEARS, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
SOUTH CAROLINA

[June 25, 2013]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, and with whom JUSTICE SCALIA joins in part, dissenting.

A casual reader of the Court's opinion could be forgiven for thinking this an easy case, one in which the text of the applicable statute clearly points the way to the only sensible result. In truth, however, the path from the text of the Indian Child Welfare Act of 1978 (ICWA) to the result the Court reaches is anything but clear, and its result anything but right.

The reader's first clue that the majority's supposedly straightforward reasoning is flawed is that not all Members who adopt its interpretation believe it is compelled by the text of the statute, see *ante,* at 1 (THOMAS, J., concurring); nor are they all willing to accept the consequences it will necessarily have beyond the specific factual scenario confronted here, see *ante,* at 1 (BREYER, J., concurring). The second clue is that the majority begins its analysis by plucking out of context a single phrase from the last clause of the last subsection of the relevant provision, and then builds its entire argument upon it. That is not how we ordinarily read statutes. The third clue is that the majority openly professes its aversion to Congress' explicitly stated purpose in enacting the statute. The majority ex-

presses concern that reading the Act to mean what it says will make it more difficult to place Indian children in adoptive homes, see *ante,* at 14, 16, but the Congress that enacted the statute announced its intent to stop "an alarmingly high percentage of Indian families [from being] broken up" by, among other things, a trend of "plac[ing] [Indian children] in non-Indian . . . adoptive homes." 25 U. S. C. §1901(4). Policy disagreement with Congress' judgment is not a valid reason for this Court to distort the provisions of the Act. Unlike the majority, I cannot adopt a reading of ICWA that is contrary to both its text and its stated purpose. I respectfully dissent.

## I

Beginning its reading with the last clause of §1912(f), the majority concludes that a single phrase appearing there—"continued custody"—means that the entirety of the subsection is inapplicable to any parent, however committed, who has not previously had physical or legal custody of his child. Working back to front, the majority then concludes that §1912(d), tainted by its association with §1912(f), is also inapplicable; in the majority's view, a family bond that does not take custodial form is not a family bond worth preserving from "breakup." Because there are apparently no limits on the contaminating power of this single phrase, the majority does not stop there. Under its reading, §1903(9), which makes biological fathers "parent[s]" under this federal statute (and where, again, the phrase "continued custody" does not appear), has substantive force only when a birth father has physical or state-recognized legal custody of his daughter.

When it excludes noncustodial biological fathers from the Act's substantive protections, this textually backward reading misapprehends ICWA's structure and scope. Moreover, notwithstanding the majority's focus on the perceived parental shortcomings of Birth Father, its rea-

soning necessarily extends to *all* Indian parents who have never had custody of their children, no matter how fully those parents have embraced the financial and emotional responsibilities of parenting. The majority thereby transforms a statute that was intended to provide uniform federal standards for child custody proceedings involving Indian children and their biological parents into an illogical piecemeal scheme.

## A

Better to start at the beginning and consider the operation of the statute as a whole. Cf. *ante,* at 13 ("[S]tatutory construction 'is a holistic endeavor[,]' and . . . '[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme'" (quoting *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988))).

ICWA commences with express findings. Congress recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," 25 U. S. C. §1901(3), and it found that this resource was threatened. State authorities insufficiently sensitive to "the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families" were breaking up Indian families and moving Indian children to non-Indian homes and institutions. See §§1901(4)–(5). As §1901(4) makes clear, and as this Court recognized in *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 33 (1989), adoptive placements of Indian children with non-Indian families contributed significantly to the overall problem. See §1901(4) (finding that "an alarmingly high percentage of [Indian] children are placed in non-Indian . . . adoptive homes").

Consistent with these findings, Congress declared its purpose "to protect the best interests of Indian children

and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards" applicable to child custody proceedings involving Indian children. §1902. Section 1903 then goes on to establish the reach of these protections through its definitional provisions. For present purposes, two of these definitions are crucial to understanding the statute's full scope.

First, ICWA defines the term "parent" broadly to mean "any biological parent . . . of an Indian child or any Indian person who has lawfully adopted an Indian child." §1903(9). It is undisputed that Baby Girl is an "Indian child" within the meaning of the statute, see §1903(4); *ante,* at 2, n. 1, and Birth Father consequently qualifies as a "parent" under the Act. The statutory definition of parent "does not include the unwed father where paternity has not been acknowledged or established," §1903(9), but Birth Father's biological paternity has never been questioned by any party and was confirmed by a DNA test during the state court proceedings, App. to Pet. for Cert. 109a (Sealed).

Petitioners and Baby Girl's guardian ad litem devote many pages of briefing to arguing that the term "parent" should be defined with reference to the law of the State in which an ICWA child custody proceeding takes place. See Brief for Petitioners 19–29; Brief for Respondent Guardian Ad Litem 32–41. These arguments, however, are inconsistent with our recognition in *Holyfield* that Congress intended the critical terms of the statute to have uniform federal definitions. See 490 U. S., at 44–45. It is therefore unsurprising, although far from unimportant, that the majority assumes for the purposes of its analysis that Birth Father is an ICWA "parent." See *ante,* at 7.

Second, the Act's comprehensive definition of "child custody proceeding" includes not only "'adoptive placement[s],'" "'preadoptive placement[s],'" and "'foster care

placement[s],'" but also "'termination of parental rights'" proceedings. §1903(1). This last category encompasses "*any* action resulting in the termination of the *parent-child relationship*," §1903(1)(ii) (emphasis added). So far, then, it is clear that Birth Father has a federally recognized status as Baby Girl's "parent" and that his "parent-child relationship" with her is subject to the protections of the Act.

These protections are numerous. Had Birth Father petitioned to remove this proceeding to tribal court, for example, the state court would have been obligated to transfer it absent an objection from Birth Mother or good cause to the contrary. See §1911(b). Any voluntary consent Birth Father gave to Baby Girl's adoption would have been invalid unless written and executed before a judge and would have been revocable up to the time a final decree of adoption was entered.[1] See §§1913(a), (c). And §1912, the center of the dispute here, sets forth procedural and substantive standards applicable in "involuntary proceeding[s] in a State court," including foster care placements of Indian children and termination of parental rights proceedings. §1912(a). I consider §1912's provisions in order.

Section 1912(a) requires that any party seeking "termination of parental rights t[o] an Indian child" provide notice to both the child's "parent or Indian custodian" and the child's tribe "of the pending proceedings and of their right of intervention." Section 1912(b) mandates that counsel be provided for an indigent "parent or Indian custodian" in any "termination proceeding." Section

—————

[1] For this reason, the South Carolina Supreme Court held that Birth Father did not give valid consent to Baby Girl's adoption when, four months after her birth, he signed papers stating that he accepted service and was not contesting the adoption. See 398 S. C. 625, 645–646, 731 S. E. 2d 550, 561 (2012). See also *ante,* at 5. Petitioners do not challenge this aspect of the South Carolina court's holding.

1912(c) also gives all "part[ies]" to a termination proceeding—which, thanks to §§1912(a) and (b), will always include a biological father if he desires to be present—the right to inspect all material "reports or other documents filed with the court." By providing notice, counsel, and access to relevant documents, the statute ensures a biological father's meaningful participation in an adoption proceeding where the termination of his parental rights is at issue.

These protections are consonant with the principle, recognized in our cases, that the biological bond between parent and child is meaningful. "[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children," we have explained, "is an interest far more precious than any property right." *Santosky* v. *Kramer*, 455 U. S. 745, 758–759 (1982) (internal quotation marks omitted). See also *infra*, at 19-20. Although the Constitution does not compel the protection of a biological father's parent-child relationship until he has taken steps to cultivate it, this Court has nevertheless recognized that "the biological connection . . . offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring." *Lehr* v. *Robertson*, 463 U. S. 248, 262 (1983). Federal recognition of a parent-child relationship between a birth father and his child is consistent with ICWA's purpose of providing greater protection for the familial bonds between Indian parents and their children than state law may afford.

The majority does not and cannot reasonably dispute that ICWA grants biological fathers, as "parent[s]," the right to be present at a termination of parental rights proceeding and to have their views and claims heard there.[2] But the majority gives with one hand and takes

_____

[2] Petitioners concede that, assuming Birth Father is a "parent" under

away with the other. Having assumed a uniform federal definition of "parent" that confers certain procedural rights, the majority then illogically concludes that ICWA's *substantive* protections are available only to a subset of "parent[s]": those who have previously had physical or state-recognized legal custody of his or her child. The statute does not support this departure.

Section 1912(d) provides that

> "Any party seeking to effect a foster care placement of, or *termination of parental rights to*, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (Emphasis added.)

In other words, subsection (d) requires that an attempt be made to cure familial deficiencies before the drastic measures of foster care placement or termination of parental rights can be taken.

The majority would hold that the use of the phrase "breakup of the Indian family" in this subsection means that it does not apply where a birth father has not previously had custody of his child. *Ante,* at 12. But there is nothing about this capacious phrase that licenses such a narrowing construction. As the majority notes, "breakup" means "'[t]he discontinuance of a relationship.'" *Ante,* at 12 (quoting American Heritage Dictionary 235 (3d ed. 1992)). So far, all of §1912's provisions expressly apply in actions aimed at terminating the "parent-child relationship" that exists between a birth father and his child, and they extend to it meaningful protections. As a logical matter, that relationship is fully capable of being pre-

––––––––––

ICWA, the notice and counsel provisions of 25 U. S. C. §§1912(a) and (b) apply to him. See Tr. of Oral Arg. 13.

served via remedial services and rehabilitation programs. See *infra*, at 15–17. Nothing in the text of subsection (d) indicates that this blood relationship should be excluded from the category of familial "relationships" that the provision aims to save from "discontinuance."

The majority, reaching the contrary conclusion, asserts baldly that "when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]' . . . by the termination of the Indian parent's rights." *Ante,* at 12. Says who? Certainly not the statute. Section 1903 recognizes Birth Father as Baby Girl's "parent," and, in conjunction with ICWA's other provisions, it further establishes that their "parent-child relationship" is protected under federal law. In the face of these broad definitions, the majority has no warrant to substitute its own policy views for Congress' by saying that "no 'relationship'" exists between Birth Father and Baby Girl simply because, based on the hotly contested facts of this case, it views their family bond as insufficiently substantial to deserve protection.[3] *Ibid.*

The majority states that its "interpretation of §1912(d) is . . . confirmed by the provision's placement next to

---

[3] The majority's discussion of §1912(d) repeatedly references Birth Father's purported "abandon[ment]" of Baby Girl, *ante,* at 12, 13, n. 8, 14, and it contends that its holding with regard to this provision is limited to such circumstances, see *ante*, at 13, n. 8; see also *ante,* at 1 (Breyer, J., concurring). While I would welcome any limitations on the majority's holding given that it is contrary to the language and purpose of the statute, the majority never explains either the textual basis or the precise scope of its "abandon[ment]" limitation. I expect that the majority's inexact use of the term "abandon[ment]" will sow confusion, because it is a commonly used term of art in state family law that does not have a uniform meaning from State to State. See generally 1 J. Hollinger, Adoption Law and Practice §4.04[1][a][ii] (2012) (discussing various state-law standards for establishing parental abandonment of a child).

§1912(e) and §1912(f)," both of which use the phrase "'continued custody.'" *Ante,* at 13. This is the only aspect of the majority's argument regarding §1912(d) that is based on ICWA's actual text rather than layers of assertion superimposed on the text; but the conclusion the majority draws from the juxtaposition of these provisions is exactly backward.

Section 1912(f) is paired with §1912(e), and as the majority notes, both come on the heels of the requirement of rehabilitative efforts just reviewed. The language of the two provisions is nearly identical; subsection (e) is headed "Foster care placement orders," and subsection (f), the relevant provision here, is headed "Parental rights termination orders." Subsection (f) reads in its entirety,

> "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." §1912(f).[4]

The immediate inference to be drawn from the statute's structure is that subsections (e) and (f) work in tandem with the rehabilitative efforts required by (d). Under subsection (d), state authorities must attempt to provide "remedial services and rehabilitative programs" aimed at avoiding foster care placement or termination of parental rights; (e) and (f), in turn, bar state authorities from order-

---

[4] The full text of subsection (e) is as follows:

"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." §1912(e).

ing foster care or terminating parental rights until these curative efforts have failed and it is established that the child will suffer "serious emotional or physical damage" if his or her familial situation is not altered.  Nothing in subsections (a) through (d) suggests a limitation on the types of parental relationships that are protected by any of the provisions of §1912, and there is nothing in the structure of §1912 that would lead a reader to expect subsection (e) or (f) to introduce any such qualification.  Indeed, both subsections, in their opening lines, refer back to the prior provisions of §1912 with the phrase "in such proceeding." This language indicates, quite logically, that in actions where subsections (a), (b), (c), and (d) apply, (e) and (f) apply too.[5]

All this, and still the most telling textual evidence is yet to come: The text of the subsection begins by announcing, "[n]o termination of parental rights may be ordered" unless the specified evidentiary showing is made.  To repeat, a "termination of parental rights" includes "*any* action resulting in the termination of the parent-child relationship," 25 U. S. C. §1903(1)(ii) (emphasis added), including the relationship Birth Father, as an ICWA "parent," has with Baby Girl.  The majority's reading disregards the Act's sweeping definition of "termination of parental rights," which is not limited to terminations of custodial relationships.

The entire foundation of the majority's argument that

──────────

[5] For these reasons, I reject the argument advanced by the United States that subsection (d) applies in the circumstances of this case but subsection (f) does not.  See Brief for United States as *Amicus Curiae* 24–26.  The United States' position is contrary to the interrelated nature of §§1912(d), (e), and (f).  Under the reading that the United States proposes, in a case such as this one the curative provision would stand alone; ICWA would provide no evidentiary or substantive standards by which to measure whether foster care placement or termination of parental rights could be ordered in the event that rehabilitative efforts did not succeed.  Such a scheme would be oddly incomplete.

subsection (f) does not apply is the lonely phrase "continued custody." It simply cannot bear the interpretive weight the majority would place on it.

Because a primary dictionary definition of "continued" is "'carried on or kept up without cessation,'" *ante,* at 8 (brackets omitted), the majority concludes that §1912(f) "does not apply in cases where the Indian parent *never* had custody of the Indian child," *ante,* at 8. Emphasizing that Birth Father never had physical custody or, under state law, legal custody of Baby Girl, the majority finds the statute inapplicable here. *Ante,* at 10–11. But "literalness may strangle meaning." *Utah Junk Co.* v. *Porter*, 328 U. S. 39, 44 (1946). See also *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 341–345 (1997) (noting that a term that may "[a]t first blush" seem unambiguous can prove otherwise when examined in the context of the statute as a whole).[6] In light of the structure of §1912, which indicates that subsection (f) is applicable to the same actions to which subsections (a) through (d) are applicable; the use of the phrase "such proceeding[s]" at the start of subsection (f) to reinforce this structural inference; and finally, the provision's explicit statement that it applies to "termination of parental rights" proceedings, the necessary conclusion is that the word "custody" does not strictly denote a state-recognized custodial relationship. If one refers back to the Act's definitional section, this conclusion is not surprising. Section 1903(1) includes "any action resulting in the termination of the parent-child relationship" within the meaning of "child custody proceeding," thereby belying any congressional intent to give the term "custody" a narrow and exclusive definition throughout the statute.

--------

[6]The majority's interpretation is unpersuasive even if one focuses exclusively on the phrase "continued custody" because, as JUSTICE SCALIA explains, *ante,* at 1 (dissenting opinion), nothing about the adjective "continued" mandates the retrospective, rather than prospective, application of §1912(f)'s standard.

In keeping with §1903(1) and the structure and language of §1912 overall, the phrase "continued custody" is most sensibly read to refer generally to the continuation of the parent-child relationship that an ICWA "parent" has with his or her child. A court applying §1912(f) where the parent does not have pre-existing custody should, as Birth Father argues, determine whether the party seeking termination of parental rights has established that the continuation of the parent-child relationship will result in "serious emotional or physical damage to the child."[7]

The majority is willing to assume, for the sake of argument, that Birth Father is a "parent" within the meaning of ICWA. But the majority fails to account for all that follows from that assumption. The majority repeatedly passes over the term "termination of parental rights" that, as defined by §1903, clearly encompasses an action aimed at severing Birth Father's "parent-child relationship" with Baby Girl. The majority chooses instead to focus on phrases not statutorily defined that it then uses to exclude Birth Father from the benefits of his parental status. When one must disregard a statute's use of terms that have been explicitly defined by Congress, that should be a signal that one is distorting, rather than faithfully reading, the law in question.

## B

The majority also does not acknowledge the full impli-

-------

[7] The majority overlooks Birth Father's principal arguments when it dismisses his reading of §1912(f) as "nonsensical." *Ante,* at 8. He does argue that *if* one accepts petitioners' view that it is impossible to make a determination of likely harm when a parent lacks custody, *then* the consequence would be that "'[n]o termination of parental rights may be ordered.'" Brief for Respondent Birth Father 39 (quoting §1912(f)). But Birth Father's primary arguments assume that it is indeed possible to make a determination of likely harm in the circumstances of this case, and that parental rights can be terminated if §1912(f) is met. See *id.,* at 40–42.

cations of its assumption that there are some ICWA "parent[s]" to whom §§1912(d) and (f) do not apply. Its discussion focuses on Birth Father's particular actions, but nothing in the majority's reasoning limits its manufactured class of semiprotected ICWA parents to biological fathers who failed to support their child's mother during pregnancy. Its logic would apply equally to noncustodial fathers who have actively participated in their child's upbringing.

Consider an Indian father who, though he has never had custody of his biological child, visits her and pays all of his child support obligations.[8]　Suppose that, due to deficien-

---

[8] The majority attempts to minimize the consequences of its holding by asserting that the parent-child relationships of noncustodial fathers with visitation rights will be at stake in an ICWA proceeding in only "a relatively small class of cases." *Ante,* at 13, n. 8. But it offers no support for this assertion, beyond speculating that there will not be many fathers affected by its interpretation of §1912(d) because it is qualified by an "abandon[ment]" limitation. *Ibid.* Tellingly, the majority has nothing to say about §1912(f), despite the fact that its interpretation of that provision is not limited in a similar way. In any event, this example by no means exhausts the class of semiprotected ICWA parents that the majority's opinion creates. It also includes, for example, biological fathers who have not yet established a relationship with their child because the child's mother never informed them of the pregnancy, see, *e.g., In re Termination of Parental Rights of Biological Parents of Baby Boy W.*, 1999 OK 74, 988 P. 2d 1270, told them falsely that the pregnancy ended in miscarriage or termination, see, *e.g., A Child's Hope, LLC* v. *Doe*, 178 N. C. App. 96, 630 S. E. 2d 673 (2006), or otherwise obstructed the father's involvement in the child's life, see, *e.g., In re Baby Girl W.*, 728 S. W. 2d 545 (Mo. App. 1987) (birth mother moved and did not inform father of her whereabouts); *In re Petition of Doe*, 159 Ill. 2d 347, 638 N. E. 2d 181 (1994) (father paid pregnancy expenses until birth mother cut off contact with him and told him that their child had died shortly after birth). And it includes biological fathers who did not contribute to pregnancy expenses because they were unable to do so, whether because the father lacked sufficient means, the expenses were covered by a third party, or the birth mother did not pass on the relevant bills. See, *e.g., In re Adoption of B. V.*, 2001 UT App 290, ¶¶ 24–31, 33 P. 3d 1083, 1087–1088.

cies in the care the child received from her custodial
parent, the State placed the child with a foster family
and proposed her ultimate adoption by them. Clearly,
the father's parental rights would have to be terminated
before the adoption could go forward.[9] On the majority's
view, notwithstanding the fact that this father would be
a "parent" under ICWA, he would not receive the benefit
of either §1912(d) or §1912(f). Presumably the court con-
sidering the adoption petition would have to apply some
standard to determine whether termination of his paren-
tal rights was appropriate. But from whence would that
standard come?

Not from the statute Congress drafted, according to the
majority. The majority suggests that it might come from
state law. See *ante,* at 13, n. 8. But it is incongruous to
suppose that Congress intended a patchwork of federal
and state law to apply in termination of parental rights
proceedings. Congress enacted a statute aimed at protect-

––––––––––

The majority expresses the concern that my reading of the statute
would produce "far-reaching consequences," because "even a sperm
donor" would be entitled to ICWA's protections. *Ante*, at 13–14, n. 8. If
there are any examples of women who go to the trouble and expense of
artificial insemination and then carry the child to term, only to put the
child up for adoption or be found so unfit as mothers that state authori-
ties attempt an involuntary adoptive placement—thereby necessitating
termination of the parental rights of the sperm donor father—the ma-
jority does not cite them. As between a possibly overinclusive in-
terpretation of the statute that covers this unlikely class of cases, and
the majority's underinclusive interpretation that has the very real
consequence of denying ICWA's protections to all noncustodial biologi-
cal fathers, it is surely the majority's reading that is contrary to ICWA's
design.

[9] With a few exceptions not relevant here, before a final decree of
adoption may be entered, one of two things must happen: "the biological
parents must either voluntarily relinquish their parental rights or have
their rights involuntarily terminated." 2A. Haralambie, Handling
Child Custody, Abuse and Adoption Cases §14.1, pp.764–765 (3d ed.
2009) (footnote omitted).

ing the familial relationships between Indian parents and their children because it concluded that state authorities "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U. S. C. §1901(5). It provided a "minimum Federal standar[d]," §1902, for termination of parental rights that is more demanding than the showing of unfitness under a high "clear and convincing evidence" standard that is the norm in the States, see 1 J. Hollinger, Adoption Law and Practice §2.10 (2012); *Santosky*, 455 U. S., at 767–768.

While some States might provide protections comparable to §1912(d)'s required remedial efforts and §1912(f)'s heightened standard for termination of parental rights, many will provide less. There is no reason to believe Congress wished to leave protection of the parental rights of a subset of ICWA "parent[s]" dependent on the happenstance of where a particular "child custody proceeding" takes place. I would apply, as the statute construed in its totality commands, the standards Congress provided in §§1912(d) and (f) to the termination of all ICWA "parent[s']" parent-child relationships.

## II

The majority's textually strained and illogical reading of the statute might be explicable, if not justified, if there were reason to believe that it avoided anomalous results or furthered a clear congressional policy. But neither of these conditions is present here.

## A

With respect to §1912(d), the majority states that it would be "unusual" to apply a rehabilitation requirement where a natural parent has never had custody of his child. *Ante,* at 14. The majority does not support this bare assertion, and in fact state child welfare authorities can and do

provide reunification services for biological fathers who
have not previously had custody of their children.[10]  And
notwithstanding the South Carolina Supreme Court's im-
precise interpretation of the provision, see 398 S. C., at
647–648, 731 S. E. 2d, at 562, §1912(d) does not require
the prospective adoptive family to themselves undertake
the mandated rehabilitative efforts.  Rather, it requires the
party seeking termination of parental rights to "satisfy
the court that active efforts have been made" to provide
appropriate remedial services.

   In other words, the prospective adoptive couple have to
make an evidentiary showing, not undertake person-to-
person remedial outreach.  The services themselves might
be attempted by the Indian child's Tribe, a state agency,
or a private adoption agency.  Such remedial efforts are
a familiar requirement of child welfare law, including fed-
eral child welfare policy.  See 42 U. S. C. §671(a)(15)(B)
(requiring States receiving federal funds for foster care
and adoption assistance to make "reasonable efforts . . . to
preserve and reunify families" prior to foster care place-
ment or removal of a child from its home).

_____

   [10] See, *e.g.,* Cal. Welf. & Inst. Code Ann. §361.5(a) (West Supp. 2013);
*Francisco G.* v. *Superior Court*, 91 Cal. App. 4th 586, 596, 110 Cal.
Rptr. 2d 679, 687 (2001) (stating that "the juvenile court 'may' order
reunification services for a biological father if the court determines that
the services will benefit the child"); *In re T. B. W.*, 312 Ga. App. 733,
734–735, 719 S. E. 2d 589, 591 (2011) (describing reunification services
provided to biological father beginning when "he had yet to establish
his paternity" under state law, including efforts to facilitate visitation
and involving father in family "'team meetings'"); *In re Guardianship
of DMH*, 161 N. J. 365, 391–394, 736 A. 2d 1261, 1275–1276 (1999)
(discussing what constitutes "reasonable efforts" to reunify a noncusto-
dial biological father with his children in accordance with New Jersey
statutory requirements); *In re Bernard T.*, 319 S. W. 3d 586, 600 (Tenn.
2010) (stating that "in appropriate circumstances, the Department [of
Children's Services] must make reasonable efforts to reunite a child
with his or her biological parents or legal parents or even with the
child's putative biological father").

There is nothing "bizarre," *ante,* at 14, about placing on the party seeking to terminate a father's parental rights the burden of showing that the step is necessary as well as justified. "For . . . natural parents, . . . the consequence of an erroneous termination [of parental rights] is the unnecessary destruction of their natural family." *Santosky*, 455 U. S., at 766. In any event, the question is a nonissue in this case given the family court's finding that Birth Father is "a fit and proper person to have custody of his child" who "has demonstrated [his] ability to parent effectively" and who possesses "unwavering love for this child." App. to Pet. for Cert. 128a (Sealed). Petitioners cannot show that rehabilitative efforts have "proved unsuccessful," 25 U. S. C. §1912(d), because Birth Father is not in need of rehabilitation.[11]

B

On a more general level, the majority intimates that ICWA grants Birth Father an undeserved windfall: in the majority's words, an "ICWA trump card" he can "play . . . at the eleventh hour to override the mother's decision and the child's best interests." *Ante,* at 16. The implicit argument is that Congress could not possibly have intended to recognize a parent-child relationship between Birth Father and Baby Girl that would have to be legally terminated (either by valid consent or involuntary termination) before the adoption could proceed.

––––––––––

[11]The majority's concerns about what might happen if no state or tribal authority stepped in to provide remedial services are therefore irrelevant here. *Ante,* at 14, n. 9. But as a general matter, if a parent has rights that are an obstacle to an adoption, the state- and federal-law safeguards of those rights must be honored, irrespective of prospective adoptive parents' understandable and valid desire to see the adoption finalized. "We must remember that the purpose of an adoption is to provide a home for a child, not a child for a home." *In re Petition of Doe*, 159 Ill. 2d, at 368, 638 N. E. 2d, at 190 (Heiple, J,. supplemental opinion supporting denial of rehearing).

But this supposed anomaly is illusory. In fact, the law of at least 15 States did precisely that at the time ICWA was passed.[12] And the law of a number of States still does so. The State of Arizona, for example, requires that notice of an adoption petition be given to all "potential father[s]" and that they be informed of their "right to seek custody." Ariz. Rev. Stat. §§8–106(G)–(J) (West Supp. 2012). In Washington, an "alleged father['s]" consent to adoption is required absent the termination of his parental rights, Wash. Rev. Code §§26.33.020(1), 26.33.160(1)(b) (2012); and those rights may be terminated only "upon a showing by clear, cogent, and convincing evidence" not only that termination is in the best interest of the child and that the

——————

[12] See Ariz. Rev. Stat. Ann. §8–106(A)(1)(c) (1974–1983 West Supp.) (consent of both natural parents necessary); Iowa Code §§600.3(2), 600A.2, 600A.8 (1977) (same); Ill. Comp. Stat., ch. 40, §1510 (West 1977) (same); Nev. Rev. Stat. §§127.040, 127.090 (1971) (same); R. I. Gen. Laws §§15–7–5, 15–7–7 (Bobbs-Merrill 1970) (same); Conn. Gen. Stat. §§45–61d, 45–61i(b)(2) (1979) (natural father's consent required if paternity acknowledged or judicially established); Fla. Stat. §63.062 (1979) (same); Ore. Rev. Stat. §§109.092, 109.312 (1975) (same); S. D. Codified Laws §§25–6–1.1, 25–6–4 (Allen Smith 1976) (natural father's consent required if mother identifies him or if paternity is judicially established); Ky. Rev. Stat. Ann. §§199.500, 199.607 (Bobbs-Merrill Supp. 1980) (same); Ala. Code §26–10–3 (Michie 1977) (natural father's consent required when paternity judicially established); Minn. Stat. §§259.24(a), 259.26(3)(a), (e), (f), 259.261 (1978) (natural father's consent required when identified on birth certificate, paternity judicially established, or paternity asserted by affidavit); N. H. Rev. Stat. Ann. §170–B:5(I)(d) (1977) (natural father's consent required if he files notice of intent to claim paternity within set time from notice of prospective adoption); Wash. Rev. Code §§26.32.040(5), 26.32.085 (1976) (natural father's consent required if paternity acknowledged, judicially established, or he files notice of intent to claim paternity within set time from notice of prospective adoption); W. Va. Code Ann. §48–4–1 (Michie Supp. 1979) (natural father's consent required if father admits paternity by any means). See also Del. Code Ann., Tit. 13, §908(2) (Michie Supp. 1980) (natural father's consent required unless court finds that dispensing with consent requirement is in best interests of the child); Wyo. Stat. Ann. §§1–22–108, 1–22–109 (Michie 1988) (same).

father is withholding his consent to adoption contrary to child's best interests, but also that the father "has failed to perform parental duties under circumstances showing a substantial lack of regard for his parental obligations," §26.33.120(2).[13]

Without doubt, laws protecting biological fathers' parental rights can lead—even outside the context of ICWA—to outcomes that are painful and distressing for both would-be adoptive families, who lose a much wanted child, and children who must make a difficult transition. See, *e.g., In re Adoption of Tobias D.*, 2012 Me. 45, ¶27, 40 A. 3d 990, 999 (recognizing that award of custody of 2½-year-old child to biological father under applicable state law once paternity is established will result in the "difficult and painful" necessity of "removing the child from the only home he has ever known"). On the other hand, these rules recognize that biological fathers have a valid interest in a relationship with their child. See *supra,* at 6. And children have a reciprocal interest in knowing their biological parents. See *Santosky*, 455 U. S., at 760–761, n. 11 (describing the foreclosure of a newborn child's opportunity to "ever know his natural parents" as a "los[s] [that] cannot be measured"). These rules also reflect the understanding that the biological bond between a parent and a child is a strong foundation on which a stable and caring relationship may be built. Many jurisdictions apply a custodial preference for a fit natural parent over a party lacking this biological link. See, *e.g., Ex parte Terry*, 494 So. 2d 628, 632 (Ala. 1986); *Appeal of H. R.*, 581 A. 2d 1141, 1177 (D. C. 1990) (opinion of Ferren, J.); *Stuhr* v. *Stuhr*, 240 Neb. 239, 245, 481 N. W. 2d 212, 216 (1992); *In re Michael B.*, 80 N. Y. 2d 299, 309, 604 N. E. 2d 122, 127 (1992). Cf. *Smith* v. *Organization of Foster Families For Equality & Reform*, 431 U. S. 816, 845 (1977) (distinguishing a natu-

_____

[13] See also, *e.g.,* Nev. Rev. Stat. §§127.040(1)(a), 128.150 (2011).

ral parent's "liberty interest in family privacy," which has its source "in intrinsic human rights," with a foster parent's parallel interest in his or her relationship with a child, which has its "origins in an arrangement in which the State has been a partner from the outset"). This preference is founded in the "presumption that fit parents act in the best interests of their children." *Troxel* v. *Granville*, 530 U. S. 57, 68 (2000) (plurality opinion). "'[H]istorically [the law] has recognized that natural bonds of affection [will] lead parents'" to promote their child's well-being. *Ibid.* (quoting *Parham* v. *J. R.*, 442 U. S. 584, 602 (1979)).

Balancing the legitimate interests of unwed biological fathers against the need for stability in a child's family situation is difficult, to be sure, and States have, over the years, taken different approaches to the problem. Some States, like South Carolina, have opted to hew to the constitutional baseline established by this Court's precedents and do not require a biological father's consent to adoption unless he has provided financial support during pregnancy. See *Quilloin* v. *Walcott*, 434 U. S. 246, 254–256 (1978); *Lehr*, 463 U. S., at 261. Other States, however, have decided to give the rights of biological fathers more robust protection and to afford them consent rights on the basis of their biological link to the child. At the time that ICWA was passed, as noted, over one-fourth of States did so. See *supra,* at 17–18.

ICWA, on a straightforward reading of the statute, is consistent with the law of those States that protected, and protect, birth fathers' rights more vigorously. This reading can hardly be said to generate an anomaly. ICWA, as all acknowledge, was "the product of rising concern . . . [about] abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families." *Holyfield*, 490 U. S., at 32. It stands to reason that the Act would not render the legal status of an Indian father's relationship with his biological child fragile, but

would instead grant it a degree of protection commensu-rate with the more robust state-law standards.[14]

## C

The majority also protests that a contrary result to the one it reaches would interfere with the adoption of Indian children. *Ante,* at 14, 16. This claim is the most perplex-ing of all. A central purpose of ICWA is to "promote the stability and security of Indian . . . families," 25 U. S. C. §1902, in part by countering the trend of placing "an alarmingly high percentage of [Indian] children . . . in non-Indian foster and adoptive homes and institutions." §1901(4). The Act accomplishes this goal by, first, protect-ing the familial bonds of Indian parents and children, see *supra,* at 4–12; and, second, establishing placement pref-erences should an adoption take place, see §1915(a). ICWA does not interfere with the adoption of Indian chil-dren except to the extent that it attempts to avert the necessity of adoptive placement and makes adoptions of Indian children by non-Indian families less likely.

The majority may consider this scheme unwise. But no principle of construction licenses a court to interpret a statute with a view to averting the very consequences Congress expressly stated it was trying to bring about. Instead, it is the "'judicial duty to give faithful meaning to

_____

[14] It bears emphasizing that the ICWA standard for termination of parental rights of which Birth Father claims the benefit is more protec-tive than, but not out of step with, the clear and convincing standard generally applied in state courts when termination of parental rights is sought. Birth Father does not claim that he is entitled to custody of Baby Girl unless petitioners can satisfy the demanding standard of §1912(f ). See Brief for Respondent Birth Father 40, n. 15. The ques-tion of custody would be analyzed independently, as it was by the South Carolina Supreme Court. Of course, it will often be the case that cus-tody is subsequently granted to a child's fit parent, consistent with the presumption that a natural parent will act in the best interests of his child. See *supra*, at 19–20.

the language Congress adopted in the light of the evident legislative purpose in enacting the law in question.'" *Graham County Soil and Water Conservation Dist.* v. *United States ex rel. Wilson*, 559 U. S. 280, 298 (2010) (quoting *United States* v. *Bornstein*, 423 U. S. 303, 310 (1976)).

The majority further claims that its reading is consistent with the "primary" purpose of the Act, which in the majority's view was to prevent the dissolution of "intact" Indian families. *Ante,* at 9–10. We may not, however, give effect only to congressional goals we designate "primary" while casting aside others classed as "secondary"; we must apply the entire statute Congress has written. While there are indications that central among Congress' concerns in enacting ICWA was the removal of Indian children from homes in which Indian parents or other guardians had custody of them, see, *e.g.,* §§1901(4), 1902, Congress also recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," §1901(3). As we observed in *Holyfield*, ICWA protects not only Indian parents' interests but also those of Indian tribes. See 490 U. S., at 34, 52. A tribe's interest in its next generation of citizens is adversely affected by the placement of Indian children in homes with no connection to the tribe, whether or not those children were initially in the custody of an Indian parent.[15]

Moreover, the majority's focus on "intact" families, *ante,* at 10, begs the question of what Congress set out to accomplish with ICWA. In an ideal world, perhaps all parents would be perfect. They would live up to their

———————

[15] Birth Father is a registered member of the Cherokee Nation, a fact of which Birth Mother was aware at the time of her pregnancy and of which she informed her attorney. See 398 S. C. 625, 632–633, 731 S. E. 2d 550, 554 (2012).

parental responsibilities by providing the fullest possible financial and emotional support to their children. They would never suffer mental health problems, lose their jobs, struggle with substance dependency, or encounter any of the other multitudinous personal crises that can make it difficult to meet these responsibilities. In an ideal world parents would never become estranged and leave their children caught in the middle. But we do not live in such a world. Even happy families do not always fit the custodial-parent mold for which the majority would reserve IWCA's substantive protections; unhappy families all too often do not. They are families nonetheless. Congress understood as much. ICWA's definitions of "parent" and "termination of parental rights" provided in §1903 sweep broadly. They should be honored.

### D

The majority does not rely on the theory pressed by petitioners and the guardian ad litem that the canon of constitutional avoidance compels the conclusion that ICWA is inapplicable here. See Brief for Petitioners 43–51; Brief for Respondent Guardian Ad Litem 48–58. It states instead that it finds the statute clear.[16] *Ante,* at 17. But the majority nevertheless offers the suggestion that a contrary result would create an equal protection problem. *Ibid.* Cf. Brief for Petitioners 44–47; Brief for Respondent

———————

[16] JUSTICE THOMAS concurs in the majority's interpretation because, although he finds the statute susceptible of more than one plausible reading, he believes that the majority's reading avoids "significant constitutional problems" concerning whether ICWA exceeds Congress' authority under the Indian Commerce Clause. *Ante,* at 1, 3–12. No party advanced this argument, and it is inconsistent with this Court's precedents holding that Congress has "broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as plenary and exclusive," founded not only on the Indian Commerce Clause but also the Treaty Clause. *United States* v. *Lara*, 541 U. S. 193, 200–201 (2004) (internal quotation marks omitted).

Guardian Ad Litem 53–55.

It is difficult to make sense of this suggestion in light of our precedents, which squarely hold that classifications based on Indian tribal membership are not impermissible racial classifications. See *United States* v. *Antelope*, 430 U. S. 641, 645–647 (1977); *Morton* v. *Mancari*, 417 U. S. 535, 553–554 (1974). The majority's repeated, analytically unnecessary references to the fact that Baby Girl is 3/256 Cherokee by ancestry do nothing to elucidate its intimation that the statute may violate the Equal Protection Clause as applied here. See *ante,* at 1, 6; see also *ante,* at 16 (stating that ICWA "would put certain vulnerable children at a great disadvantage solely because an ancestor—*even a remote one*—was an Indian" (emphasis added)). I see no ground for this Court to second-guess the membership requirements of federally recognized Indian tribes, which are independent political entities. See *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 72, n. 32 (1978). I am particularly averse to doing so when the Federal Government requires Indian tribes, as a prerequisite for official recognition, to make "descen[t] from a historical Indian tribe" a condition of membership. 25 CFR §83.7(e) (2012).

The majority's treatment of this issue, in the end, does no more than create a lingering mood of disapprobation of the criteria for membership adopted by the Cherokee Nation that, in turn, make Baby Girl an "Indian child" under the statute. Its hints at lurking constitutional problems are, by its own account, irrelevant to its statutory analysis, and accordingly need not detain us any longer.

## III

Because I would affirm the South Carolina Supreme Court on the ground that §1912 bars the termination of Birth Father's parental rights, I would not reach the question of the applicability of the adoptive placement

preferences of §1915. I note, however, that the majority does not and cannot foreclose the possibility that on remand, Baby Girl's paternal grandparents or other members of the Cherokee Nation may formally petition for adoption of Baby Girl. If these parties do so, and if on remand Birth Father's parental rights are terminated so that an adoption becomes possible, they will then be entitled to consideration under the order of preference established in §1915. The majority cannot rule prospectively that §1915 would not apply to an adoption petition that has not yet been filed. Indeed, the statute applies "[i]n *any* adoptive placement of an Indian child under State law," 25 U. S. C. §1915(a) (emphasis added), and contains no temporal qualifications. It would indeed be an odd result for this Court, in the name of the child's best interests, cf. *ante,* at 15, to purport to exclude from the proceedings possible custodians for Baby Girl, such as her paternal grandparents, who may have well-established relationships with her.

*        *        *

The majority opinion turns §1912 upside down, reading it from bottom to top in order to reach a conclusion that is manifestly contrary to Congress' express purpose in enacting ICWA: preserving the familial bonds between Indian parents and their children and, more broadly, Indian tribes' relationships with the future citizens who are "vital to [their] continued existence and integrity." §1901(3).

The majority casts Birth Father as responsible for the painful circumstances in this case, suggesting that he intervened "at the eleventh hour to override the mother's decision and the child's best interests," *ante,* at 16. I have no wish to minimize the trauma of removing a 27-month-old child from her adoptive family. It bears remembering, however, that Birth Father took action to assert his parental rights when Baby Girl was four months old, as soon as

he learned of the impending adoption.  As the South Caro-
lina Supreme Court recognized, "'[h]ad the mandate of . . .
ICWA been followed [in 2010], . . . much potential anguish
might have been avoided[;] and in any case the law cannot
be applied so as automatically to "reward those who obtain
custody, whether lawfully or otherwise, and maintain it
during any ensuing (and protracted) litigation."'"   398
S. C., at 652, 731 S. E. 2d, at 564 (quoting *Holyfield*, 490
U. S., at 53–54).

   The majority's hollow literalism distorts the statute and
ignores Congress' purpose in order to rectify a perceived
wrong that, while heartbreaking at the time, was a correct
application of federal law and that in any case cannot be
undone.  Baby Girl has now resided with her father for 18
months.  However difficult it must have been for her to
leave Adoptive Couple's home when she was just over 2
years old, it will be equally devastating now if, at the age
of 3½, she is again removed from her home and sent to live
halfway across the country.  Such a fate is not foreor-
dained, of course.  But it can be said with certainty that
the anguish this case has caused will only be compounded
by today's decision.

   I believe that the South Carolina Supreme Court's
judgment was correct, and I would affirm it.  I respectfully
dissent.